of staying, and even if he has actually established his domicile there, provided he afterwards attempts to enter the United States.

We think the former construction right. The country in which the alien was born is important only if the statute requires or authorizes him to be returned there, as in the provision of section 3 of the act of 1907 (Comp. St. 1913, § 4247) that he shall be "returned to the country whence he came, or of which he is a subject or a citizen," or as in the provision of section 2 of the Chinese Exclusion Act of 1892 (Comp. St. 1913, § 4316), that he "shall be removed from the United States to China, unless he or they shall make it appear to the justice, judge, or commissioner before whom he or they are tried that he or they are subjects or citizens of some other country, in which case he or they shall be removed from the United States to such country." If the deportation proceedings had been instituted under the Chinese Exclusion Acts, a different question would have arisen.

It is often intimated that an alien must be returned to the country of his nativity, because that was ordered in Lewis v. Frick, 233 U. S. 291, 34 Sup. Ct. 488, 58 L. Ed. 967. In that case a Russian, who had lived in the United States for several years, visited Canada for one day and returned with a prostitute. He was deported to Russia, which was the country of his nativity. It was also the country from which he originally came via London, as an examination of the transcript of record will show. Mr. Justice Pitney says:

"But since his offense was not discovered in time to permit of his physical exclusion, so that he becomes subject to the provisions for deportation, his destination ought not to be controlled by the factitious circumstance that he went into Canada to procure the prostitute. And, upon the whole, it seems to us that the act reasonably admits of his being returned to the land of his nativity, that being in fact the 'country whence he came' when he first entered the United States."

We think that the residence of this relator for three or four years in Canada before his attempt to enter the United States cannot be regarded as what Mr. Justice Pitney called a factitious circumstance. The Supreme Court in Lewis v. Frick, supra, left open the question whether "that part of the deportation order which determines the destination of the alien is open to inquiry upon habeas corpus," and we will therefore follow our previous practice by modifying the order of deportation by directing the alien to be returned to Canada.

---

### In re LOEB et al.

(Circuit Court of Appeals, Second Circuit. April 11, 1916.)

### No. 224.

BANKRUPTCY ☞408(3)—DISCHARGE—CONCEALMENT OF ASSETS.

In December, 1911, the bankrupt signed a statement certifying that his assets amounted to $12,000 and his liabilities to $2,000. Thereafter another entered into partnership with the bankrupt, investing $3,000 in cash in the business. In October, 1912, the petition in bankruptcy was filed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Held* that, where there was a deficit of over $4,000 at the time of bankruptcy, and the bankrupt made no showing to explain the loss, his discharge will be denied, on the ground of concealment of assets.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 735, 736; Dec. Dig. ☞408(3).]

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the bankruptcy of Max Loeb and Solomon Liban, doing business as M. Loeb & Co. From an order dismissing the petition of Max Loeb for a discharge, and refusing to grant a discharge to said bankrupt, he appeals. Affirmed.

Morrison & Schiff, of New York City (I. D. Morrison, of New York City, and Leo N. Haiblum, of Stapleton, N. Y., of counsel), for appellant.

M. C. Ansorge, of New York City, for objecting creditor Bryant Park Bank.

Before COXE and ROGERS, Circuit Judges, and HOUGH, District Judge.

COXE, Circuit Judge. A discharge was refused the bankrupt, Max Loeb, on the sole ground that he had concealed assets belonging to the firm and in its possession prior to the bankruptcy. The petition in bankruptcy was filed October 28, 1912. The proof that such assets existed was found in a statement signed by the bankrupt and ending with the following certificate:

"The above statement printed and written has been carefully read by the undersigned and is full and correct.                    Max Loeb.
"Date, Dec. 20, 1911."

This statement showed total assets amounting to $12,233.32 and total liabilities of $2,307, leaving a "net worth" in December, 1911, of $9,926.32. The statement also showed that there was no contingent liability "upon accommodation indorsements," "upon exchanged paper," "for guaranties," "for bonds" and no "assets or liabilities pledged as, or secured by, collateral." Here, then, was a statement by the bankrupt showing an excellent financial condition which, if true, would make any extension of credit to Loeb, within reasonable limits, absolutely safe.

About this time Solomon Liban entered the partnership, investing therein the sum of $3,000 in cash, so that if the statement had been true, the firm would have had a surplus over liabilities of about $13,000. The bankrupt Loeb does not pretend that this statement was false and as to him, at least, it must be taken as true. He cannot be heard to contradict his own guaranty that the statement "is full and correct." When the firm failed about ten months after the statement was made there was a deficit of over $4,000 so that the bankrupt Loeb must account for a total loss of $16,000 during this period. This he has entirely failed to do.

The decree of the District Court is affirmed.